UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
BEAZLEY INSURANCE COMPANY, INC.,          :
                                          :
                                          :   15-cv-5119 (JSR)
        Plaintiff,                        :
                                          :      OPINION
        -v-                               :
                                          :
ACE AMERICAN INSURANCE COMPANY, et al.,   :   USDC SDNY
                                          :   DOCUMENT
        Defendants.                       :   ELECTRONICALLY FILED
----------------------------------------x     DOC #:
                                              DATE FILED: 12/21/15
JED S. RAKOFF, U.S.D.J.

    This dispute concerns which of NASDAQ's insurers is obligated
to provide NASDAQ coverage in connection with an underlying class
action that was filed against NASDAQ in the aftermath of the
troubled Facebook IPO in May 2012 (the "Facebook Class Action"). By
"bottom-line" order dated October 20, 2015, this Court granted
plaintiff's motion for partial summary judgment as to Count One
against defendant ACE American Insurance Company. The Court also
granted in part and denied in part defendants' motions to dismiss.
This Opinion explains the reasons for those rulings.

    By way of background, plaintiff Beazley Insurance Company, Inc.
("Beazley") was the first-layer excess errors and omissions ("E&O")
insurer to NASDAQ during the relevant time. Beazley issued Excess
Insurance Policy No. V15NOP120401 to NASDAQ OMX Group, Inc. for the
policy period of January 31, 2012 to January 31, 2013 (the "Beazley
E&O Policy"). Non-party Chartis Specialty Insurance Company
("Chartis") was NASDAQ's primary E&O insurer during the relevant

time and issued NASDAQ OMX Group, Inc., an errors and omissions insurance policy for the same policy period ("the Chartis E&O Policy"). The E&O policies provided NASDAQ with coverage, in relevant part, for "Damages resulting from any Claim . . . for any Wrongful Act . . . solely in rendering or failing to render Professional Services." Compl., Ex. C. § 1.I. The Beazley E&O Policy followed the form of the Chartis E&O Policy and provided its own excess coverage of $15 million once Chartis's limit of liability was exhausted.

Defendant ACE American Insurance Company ("ACE") was the primary directors and officers ("D&O") liability insurer for NASDAQ during the relevant period. ACE issued ACE Advantage Management Protection Policy No. DON G21666944 010 to NASDAQ OMX Group, Inc. for the policy period of January 31, 2013 to January 31, 2014 (the "ACE D&O Policy").[1] The ACE D&O Policy has a $15 million limit of liability. Defendant Illinois National Insurance Company ("INIC") was NASDAQ's first-layer excess D&O insurer during the relevant time. INIC issued Excess Edge Policy No. 01-656-32-59 to NASDAQ for the policy period of January 31, 2013 to January 31, 2014 (the "INIC D&O Policy"). The INIC D&O Policy follows the form of the ACE D&O Policy and provides excess insurance above that policy's $15 million limit of liability. However, the ACE D&O Policy contains a policy

---

[1] ACE acknowledged in an October 8, 2013 letter to NASDAQ that the underlying class action against NASDAQ qualified as a "Prior Covered Claim" under the ACE D&O Policy, and ACE does not contend otherwise in this litigation. *See* Compl., Ex. F.

exclusion "for that portion of Loss on account of any Claim . . . by or on behalf of a customer or client of [NASDAQ], alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services."[2] Compl., Ex. D, § III (as amended by Endorsement Nos. 10 and 19). This litigation turns on the scope of that policy exclusion (the "Professional Services exclusion").

In 2012, Facebook opted to list its shares on NASDAQ -- a choice that was initially perceived as a coup for that exchange. Amid much fanfare and strong demand, Facebook went public on May 18, 2012. The honeymoon ended abruptly on the day of the IPO when trading was allegedly marred by significant technical problems as a result of widespread NASDAQ system failures.

Shortly thereafter, dozens of plaintiffs across the country filed suit against various participants in the IPO. On October 4, 2012, the MDL Panel centralized 41 actions relating to the Facebook IPO in the Southern District of New York before Judge Sweet, including ten actions brought against NASDAQ by NASDAQ members and by retail investors in Facebook, alleging federal securities violations and negligence. *See In re: Facebook, Inc., IPO Sec. & Deriv. Litig.*, 899 F. Supp. 2d 1374, 1377 (J.P.M.L. 2012); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 288 F.R.D. 26, 30 n.3 (S.D.N.Y. 2012). Judge Sweet subsequently consolidated the actions

---

[2] Though many capitalized terms in the relevant policies are in boldface, the Court has chosen not to maintain such bolding in this Opinion, as it is immaterial to the contractual interpretation.

brought against NASDAQ into a separately consolidated action for pretrial proceedings. 288 F.R.D. at 30.

On April 30, 2013, a consolidated amended class action complaint (the "CAC") was filed against NASDAQ parties on behalf of a putative class of all persons "that entered premarket and aftermarket orders to purchase and/or sell the common stock of Facebook . . . on May 18, 2012 . . . in connection with Facebook's initial public offering . . . and who thereby suffered monetary losses" as a result of the NASDAQ defendants' alleged misconduct. Compl., Ex. A at 1. The CAC was brought by a "Securities Class" alleging violations of the federal securities laws and a "Negligence Class" alleging claims for common law negligence. *See id.*

According to the CAC, on the day of the Facebook IPO, NASDAQ could not timely execute pre-market orders as a result of known system limitations. Rather than suffer the embarrassment of delaying trading, NASDAQ opted to resort to an untested backup system. The subsequent "wholesale breakdown in NASDAQ's trading platforms caused Class Members substantial damages by, *inter alia*: (i) causing erroneous and failed trade executions; (ii) blinding Class Members for hours - if not days - as to their then-current positions in Facebook stock due to late and/or missing trade confirmations; (iii) preventing Class Members from executing orders at the National Best Bid/Offer [] prices for Facebook stock as required by SEC Reg. NMS; and (iv) exposing Class Members to related failures of the NASDAQ trading platform, resulting in, among other things, an artificial

4

downward pressure on the price of Facebook's stock." *Id.* ¶ 15. The
CAC also alleged that the NASDAQ defendants "negligently designed,
developed, tested, and implemented NASDAQ's IPO Cross software and,
as a result, breached their common law duty of care to Class Members
in connection with the listing and trading of Facebook's IPO." *Id.*
¶ 40.

On or about May 13, 2013, NASDAQ's insurance broker provided
notice of the Facebook Class Action to Chartis, Beazley, ACE, and
INIC, among other insurers. *See* Pl.'s Rule 56.1(a) Statement, ¶ 59.[3]
According to plaintiff's complaint, Chartis, which (as noted)
insures NASDAQ for claims arising "solely in rendering or failing to
render Professional Services," issued a reservation of rights letter
and agreed to advance defense costs under its primary E&O policy.
Compl., ¶ 36. Beazley, for its part, accepted potential coverage
under its excess E&O policy, subject to a reservation of rights.
Declaration of Carrie Parikh dated July 31, 2015 ("Parikh Decl.") at
¶ 2, ECF No. 23. ACE, however, disclaimed coverage, relying
primarily on the Professional Services exclusion.

In April 2015, NASDAQ settled the Facebook Class Action for
$26.5 million. In connection with that settlement, NASDAQ entered
into an agreement with Beazley that required Beazley to contribute
the full $15 million limit of liability on its excess E&O policy
within ten business days of final approval of the settlement and by

---

[3] Facts recited here that are pertinent to plaintiff's motion for
partial summary judgment are undisputed.

which NASDAQ assigned to Beazley its claims against ACE and INIC in connection with the CAC. *Id.* ¶ 5; Compl. ¶ 5. On June 25, 2015, Judge Sweet issued an order preliminarily approving the settlement. *See* Parikh Decl. ¶ 5. A fairness hearing was held before Judge Sweet on September 16, 2015, and the settlement received final approval on November 9, 2015. *See* Order and Final Judgment, *In re: Facebook, Inc., IPO Sec. and Deriv. Litig.*, 12-md-2389, ECF No. 373.

On June 30, 2015, Beazley filed the instant action against ACE and INIC, bringing five causes of action. Beazley's first cause of action seeks a declaratory judgment that NASDAQ is entitled to coverage for defense costs under defendants' D&O policies in connection with NASDAQ's defense of the CAC.[4] Beazley's second cause of action seeks a declaratory judgment that NASDAQ is entitled to indemnity coverage under defendants' D&O policies in connection with the CAC. Beazley's third and fourth causes of action seek indemnification and contribution from defendants, respectively, for amounts that Beazley paid in connection with the CAC settlement that Beazley alleges should have been paid by defendants. Beazley's fifth cause of action -- brought in its capacity as NASDAQ's assignee -- seeks damages for defendants' alleged breach of their insurance policies with NASDAQ.

---

[4] Under the ACE D&O Policy, "the Insurer shall, no later than quarterly, advance on behalf of the Insureds covered Defense Costs which the Insureds have incurred in connection with Claims made against them, prior to disposition of such Claims." Compl., Ex. D, § X.E.

On July 31, Beazley moved for partial summary judgment against ACE on Count One, seeking a declaratory judgment that ACE is obligated to cover NASDAQ's defense costs under the ACE D&O Policy. Simultaneously, ACE and INIC moved to dismiss the complaint in its entirety.

Turning first to Beazley's motion, under Rule 56(a) of the Federal Rules of Civil Procedure "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).

Under New York law,[5] to determine whether an insurer owes a duty to advance defense costs, courts apply the same standard used to assess whether an insurer owes a duty to defend. *See Lowy v. Travelers Prop. & Cas. Co.*, 2000 WL 526702, at *2 n.1 (S.D.N.Y. May 2, 2000) ("[T]here is no relevant difference between the allegations that trigger an insurer's duty to defend and the allegations that trigger an insurer's obligation to pay defense expenses."). Furthermore, an "insurer's duty to defend and to pay defense costs . . . must be construed broadly in favor of the policyholder," *Admiral Ins. Co. v. Weitz & Luxenberg, P.C.*, 2002 WL 31409450, at *3 (S.D.N.Y. Oct. 24, 2002), while policy exclusions "are to be accorded a strict and narrow construction," *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 908 N.E.2d 875, 877 (2009)

---

[5] The parties agree that New York law applies to the policies at issue.

(citation omitted). Indeed, the New York Court of Appeals "has specifically held that for an insurer to be relieved of the duty to defend based on a policy exclusion, it 'bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion [and] that the exclusion is subject to no other reasonable interpretation . . . .'" *Cont'l Cas. Co. v. JBS Const. Mgmt., Inc.*, 2010 WL 2834898, at *2 (S.D.N.Y. July 1, 2010) (quoting *Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.,* 91 N.Y.2d 169, 175 (1997)).

In disclaiming coverage for defense costs, ACE relies on the Professional Services exclusion in its D&O policy, which provides that "[ACE] shall not be liable for that portion of Loss on account of any Claim . . . by or on behalf of a customer or client of [NASDAQ], alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services." Compl., Ex. D, § III (as amended by Endorsement Nos. 10 and 19). ACE does not dispute that the CAC constitutes a "Claim" under its D&O policy that would be covered but for the Professional Services exclusion.[6]

---

[6] Insuring Agreement B of the ACE D&O Policy provides coverage for "all Loss for which [NASDAQ] has indemnified [its directors and officers] and which [those directors and officers] have become legally obligated to pay by reason of a Claim . . . for any Wrongful Acts." Insuring Agreement C provides coverage for "all Loss for which [NASDAQ] becomes legally obligated to pay by reason of a Securities Claim . . . for any Wrongful Acts." The Policy defines "Claim" to include a "written demand for monetary damages" and a "civil . . . proceeding . . . for monetary damages." "Loss" is defined to include "Defense Costs," which in turn is defined as "reasonable and necessary costs, charges, fees and expenses incurred by any Insured in defending Claims." It is true that INIC, in its

Rather, it argues (1) that the CAC was not brought "by or on behalf of a customer or client of [NASDAQ]," and (2) that the claims in the CAC are not "alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services."

Neither "customer or client" nor "professional services" is defined in the ACE D&O Policy. Beazley argues that "NASDAQ's customers are the individual companies that choose to list on the NASDAQ exchange and its members, the so-called market makers, through which retail investors may purchase and sell stock listed on the NASDAQ exchange," rather than the retail investors themselves. Beazley Opening Br. at 20, ECF No. 24. ACE, on the other hand, argues that retail investors in companies listed on NASDAQ's exchange (such as Facebook) are indeed "customer[s] or client[s]" of NASDAQ because "each [investor] purchased a service from NASDAQ . . . through a Member," "direct[ing] a transaction in Facebook Stock using the NASDAQ exchange," and because NASDAQ receives a fee for

motion to dismiss, argues that the CAC is not a "Securities Claim" because "the emphasis throughout the definition [of 'Securities Claim'] . . . is on the Company's securities," and the CAC does "not involve NASDAQ securities." INIC Reply Br. at 3, ECF No. 50. However, this argument disregards the plain language of Insuring Agreement C, which provides that a Securities Claim is "*any* Claim . . . alleging a violation of any federal . . . rule or statute . . . regulating securities, *including but not limited to* the purchase or sale of, or offer to purchase or sell, or solicitation of any offer to purchase or sell, any securities issued by the Company . . . ." Compl., Ex. D, § II.O (as amended by Endorsement No. 12) (emphasis added). There can be no serious argument (and none is offered) that the CAC does not constitute a "Claim . . . alleging a violation of any federal . . . rule or statute . . . regulating securities."

each transaction. ACE Reply Brief in Support of Mot. to Dismiss at 7, ECF No. 44.[7]

Given that the ACE D&O Policy is silent as to the meaning of "customer or client" in the Professional Services exclusion, both parties look outside the D&O Policy to shore up their arguments. Beazley notes the obvious point that not all end users of goods or services are "customers" of every goods or services provider in a distribution chain, and ACE responds with the equally self-evident point that a retail investor can be the "customer or client" of more than one service provider. ACE further argues that basic agency principles dictate that retail investors can simultaneously be the "customer[s] or client[s]" of multiple service providers -- in this case, both their brokers (*i.e.*, their agents) and NASDAQ. But ACE fails to establish why "customer[s] or client[s]" *must* include retail investors in the context of this policy exclusion. Indeed, none of these observations does anything to resolve the ambiguity in the D&O Policy as to the scope of the exclusion.[8]

---

[7] Because the application of the Professional Services exclusion is thoroughly briefed in defendants' motions to dismiss as well as on plaintiff's motion for partial summary judgment, the Court draws on the (largely overlapping) arguments made in both sets of papers.

[8] The parties also marshal purportedly dueling dictionary definitions that are not actually at odds or particularly helpful. *Compare* ACE Opp. Br. at 8, ECF No. 38 (a customer is "one that purchases a commodity or service" (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 214 (10th ed. 1998))), *with* Beazley Reply Br. at 6, ECF No. 45 (a customer is a "person or organization that buys goods or services from a store or business" (quoting Oxford Online Dictionary, http://www.oxforddictionaries.com/us/definition/american_english/customer)).

The parties' discussion of industry usage is more pertinent. Beazley focuses on the "Accommodation Plan" that NASDAQ submitted to the SEC in the aftermath of the Facebook IPO in an effort to compensate its members for the system failures that day. In the Accommodation Plan, NASDAQ explained that its "business and legal relationships are with its members, not its members' customers [and that] *Nasdaq has no contractual or other relationships with its members' customers* . . . ." Declaration of Kevin F. Kieffer dated July 31, 2015, Ex. 10 at 45712 (emphasis added), ECF No. 22-10.

ACE, less convincingly, observes that the CAC itself appears to conceive of retail investors in Facebook as "customers" of NASDAQ. The CAC notes on several occasions, for example, that NASDAQ's system failures "prevented the majority of NASDAQ's customer base from knowing their true positions in Facebook." CAC ¶ 8; *see also id.* ¶ 133 ("Defendants . . . put their own business interests ahead of the interests of NASDAQ's customers and members . . . ."); *id.* ¶ 216 ("NASDAQ's customers were forced to carry significant positions in Facebook over the weekend . . . ."). However, the fact that the CAC might allege that the class members are "customers" of NASDAQ does not make it so. More appropriately, ACE also argues that NASDAQ itself has, on occasion, described retail investors as "customers." But the primary example ACE invokes in support of this argument is not very compelling. Specifically, ACE points to the fact that in the context of a proposed rule change, NASDAQ stated:

> The proposed price reduction [for NASDAQ market data and
> for trading on NASDAQ] is targeted at retaining the
> business of members that represent retail investors and
> that redistribute market data to them in a non-
> professional capacity. NASDAQ believes that this proposal
> thereby promotes NASDAQ's and the Commission's goal of
> better serving long-term, retail investors and restoring
> confidence in public capital markets. The participation of
> these investors in NASDAQ's market benefits NASDAQ, its
> listed companies, its market quality, and the quality of
> its data products. The proposal is also a competitive
> response to other trading venues that have used price
> discounts to entice firms to shift order flow and data
> consumption, and that may continue to do so in the future.
> In short, NASDAQ is attempting to compete on price for the
> business of customers that are highly valued to NASDAQ and
> important to the health of U.S. capital markets.

Affirmation of Daniel W. London dated Aug. 14, 2015, Ex. F at 3, ECF

No. 35-6.

But at best, the reference to "customers" in the last sentence

of the passage is ambiguous. Indeed, the reference is more fairly

read, in context, to refer to NASDAQ's members.

On balance, the Court is in agreement with Beazley that

interpreting "customer[s] or client[s]" to exclude retail investors

in a public company listed on NASDAQ is at least one reasonable

interpretation of the ACE D&O Policy. As a consequence, ACE has

failed to satisfy its "heavy burden of demonstrating that . . . that

the [Professional Services] exclusion is subject to no other

reasonable interpretation" than the one it has proffered to disclaim

coverage, and ACE was therefore obligated to provide NASDAQ with

defense costs coverage in connection with NASDAQ's defense of the

CAC.[9] Because, moreover, the Court grants partial summary judgment on Count One against ACE on this basis, it need not at the present time reach the issue of whether the claims in the CAC are "alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services."

The Court now turns to defendants' many arguments for dismissing the complaint. To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). With respect to those arguments made under Rule 12(b)(6), the Court must draw all reasonable inferences in plaintiff's favor and accept as true all well-pleaded factual allegations in its complaint. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).

Three of defendants' arguments raised in their motions to dismiss apply to all or several of plaintiff's causes of action, and the Court addresses these arguments at the outset before turning to defendants' claim-specific arguments.

First, for the same reasons that the Court grants plaintiff partial summary judgment on its first cause of action, the Court

---

[9] To be clear, the Court is not interpreting "customer[s] or client[s]" to exclude retail investors as a matter of law, as that is not the relevant question for purposes of plaintiff's motion. Defendants are free, with the benefit of discovery, to renew their arguments as to the meaning of "customers or clients" on summary judgment.

rejects defendants' arguments that plaintiff's claims fail because the CAC falls within the scope of the Professional Services exclusion.

Second, in an argument that is only applicable to INIC, INIC argues that Beazley's claims against it are not ripe because a condition precedent to INIC's coverage obligations has not been satisfied.[10] Specifically, under INIC's D&O policy, INIC's coverage obligations "attach . . . only after the Total Underlying Limits [under ACE's D&O policy] have been exhausted through payments by, on behalf of or in the place of [ACE] of amounts covered under [ACE's D&O Policy]." Compl., Ex. E ("Insuring Agreement"). The INIC D&O Policy goes on to state that "[t]he risk of uncollectability of any part of the Total Underlying Limits, for any reason, is expressly retained by the Policyholder . . . ." Id. The Court agrees that this provision plainly constitutes a condition precedent to coverage. See Ali v. Fed. Ins. Co., 719 F.3d 83, 91 (2d Cir. 2013) (finding that a substantially similar provision in an excess insurance policy "establishe[d] a clear condition precedent" to coverage that had not been met). Because Beazley does not allege that the ACE D&O Policy

---

[10] INIC oddly appears to limit the reach of this argument in its opening brief to Beazley's first cause of action for a declaratory judgment. See INIC Opening Br. at 20-21, ECF No. 33. In its reply brief, however, INIC casts the argument as a ripeness argument that is applicable to all claims. See INIC Reply Br. at 7-8 ("Accordingly, Beazley's claims against Illinois National are premature.")

limits have been exhausted, INIC contends that Beazley's claims are premature.

INIC is half-right. This Court's decision in *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293 (S.D.N.Y. 2003) is instructive. There, defendant-insurer sought dismissal of the complaint on the ground that its claims were not ripe. Plaintiff's complaint alleged four causes of action, two of which sought damages for breach of contract and two of which sought declaratory relief. *See id.* at 294-95. The insurance policy at issue provided that defendant's payment obligation only arose 30 days after "presentation and acceptance [by defendant] of proofs of loss," which plaintiff had not filed at the time of suit. *Id.* at 295. Because "payment by defendant [was] not yet due," plaintiff's breach of contract claims were premature and the Court dismissed them without prejudice as unripe. *Id.* The Court found that the claims seeking declaratory relief survived, however, because an actual controversy existed between the parties and "judgment on [the declaratory judgment counts would] almost certainly resolve the primary issue in this case as to scope of coverage." *Id.* at 296.

The same logic governs here. As to Beazley's three claims against INIC for indemnification, contribution, and breach of contract, Beazley has jumped the gun and the claims are dismissed as unripe. Beazley's claims against INIC for declaratory relief survive, however, as "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment" under the Declaratory Judgment Act, 28 U.S.C. § 2201. *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Third, ACE argues that Beazley lacks standing to bring this action, largely on the basis that because the settlement of the CAC had not yet received final approval from the district court at the time the parties briefed the instant motions, Beazley has failed to allege an actual loss (either on its part or NASDAQ's).[11] While the settlement of the CAC has now received final approval from Judge Sweet, ACE's argument is not moot "[b]ecause a plaintiff's standing to sue is assessed based on facts existing at the time of filing suit." *Sharehold Representative Servs. LLC v. Sandoz Inc.*, 2013 WL 4015901, at *7 (S.D.N.Y. Aug. 7, 2013); *see also Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 422 (2d Cir. 2015) ("A court may not permit an action to continue, even where the jurisdictional deficiencies have been subsequently cured, if jurisdiction [was] lacking at the commencement of a suit." (internal quotation marks omitted)). ACE's argument is, nonetheless, erroneous.

Specifically, as to Beazley's first two counts seeking declaratory relief, NASDAQ had already incurred significant defense

---

[11] ACE purports to make this argument pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. Rule 12(b)(3) authorizes a party to move to dismiss on the basis of improper venue -- something neither defendant has done. ACE's argument is properly made under Rule 12(b)(1), which authorizes motions to dismiss based on lack of subject-matter jurisdiction.

costs and the settlement of the Facebook Class Action had already received preliminary approval at the time plaintiff filed its complaint. Given that the parties vigorously dispute their coverage obligations, the Court again finds that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" sufficient to invoke the jurisdiction of this Court under the Declaratory Judgment Act. *Maryland Cas. Co.*, 312 U.S. at 273.[12] As for Beazley's three remaining claims, as noted, NASDAQ had already incurred losses in the form of defense costs at the time this suit was commenced. And, in any case, the injury-in-

---

[12] It is true, as INIC points out, that the general rule is that "until the underlying action is decided, dismissal of an insurance company's declaratory judgment action for indemnity is appropriate." *Specialty Nat. Ins. Co. v. English Bros. Funeral Home*, 606 F. Supp. 2d 466, 472 (S.D.N.Y. 2009). However, this is not a "*per se* rule" and courts have made exceptions to it where the policy animating the rule -- *i.e.*, that the duty to indemnify (in contrast to the duty to defend) often requires consideration of factual disputes -- is not served. *See Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261-62 (S.D.N.Y. 2013) (finding exception to rule where policy purpose was not served). That is the case here, where the dispute between the parties turns on the proper interpretation of the "Professional Services" exclusion -- a question of law that will not necessarily require the consideration of factual disputes.

INIC also appears to argue that the Court lacks subject-matter jurisdiction because a claim for indemnification requires a finding of liability, and the Stipulation of Settlement in the Facebook Class Action states that it "shall not be construed as . . . an admission or concession on the part of [NASDAQ] . . . of any fault or liability." INIC Opening Br. at 17, ECF No. 33. This argument is borderline frivolous, as the defendants' D&O policies indisputably insure NASDAQ for "Loss," which is defined to include settlements. As such, defendants' duty to indemnify is implicated by the settlement of the CAC unless the Professional Services exclusion is triggered.

fact requirement under the Supreme Court's standing doctrine does
not require injury that has already occurred, but rather a "concrete
and particularized" injury that is "actual *or* imminent, not
conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 560 (1992) (emphasis added) (internal quotation marks
omitted). "An allegation of future injury may suffice if the
threatened injury is 'certainly impending,' or there is a
'substantial risk' that the harm will occur." *Susan B. Anthony List
v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks
omitted). Here, there is nothing conjectural or hypothetical about
NASDAQ and Beazley's loss. To the contrary, at the time Beazley
filed its complaint, the settlement of the CAC had garnered
preliminary court approval, such that the threatened injury was
imminent. Moreover, the settlement, as noted, has now been finally
approved, and "[a]lthough a plaintiff's standing is 'assessed as of
the time the lawsuit is brought,' post-filing events may confirm
that a plaintiff's fear of future harm is reasonable." *Baur v.
Veneman*, 352 F.3d 625, 638 (2d Cir. 2003) (citation omitted).

The remainder of defendants' arguments in support of their
motions to dismiss are claim-specific and addressed in turn.

Defendants argue that Beazley's third cause of action, seeking
indemnification from ACE and INIC for the amounts it has paid or
agreed to pay on behalf of NASDAQ, but for which the defendants are
allegedly principally liable, is not cognizable under New York law.
To state a common law indemnity claim, Beazley must plead a breach

of duty by defendants to NASDAQ, as well as a duty running from
defendants to Beazley. *See Perkins Eastman Architects, P.C. v. Thor
Eng'rs., P.A.*, 769 F. Supp. 2d 322, 329 (S.D.N.Y. 2011) ("[A] cause
of action for common-law indemnification can be sustained only if:
(1) the party seeking indemnity and the party from whom indemnity is
sought have breached a duty to a third person, and (2) some duty to
indemnify exists between them."). "[A] valid claim for indemnity
requires, at the very least, that the party seeking indemnification
was held liable to the injured party." *Tokio Marine & Nichido Fire
Ins. Co. v. Calabrese*, 2013 WL 752259, at *19 (E.D.N.Y. Feb. 26,
2013). Beazley has not pleaded a duty running from defendants to
Beazley, nor has it even briefed the elements of the claim.
Moreover, according to its own pleading, Beazley has not been "held
liable" to any injured party -- rather it pleads that "it has no
obligation to [NASDAQ] under the Beazley Policy in connection with
the CAC." Compl. ¶ 64. As such, the claim is fatally deficient.

Furthermore, the two cases Beazley cites in support of the
viability of its indemnity claim are both unavailing. *Clarendon
National Insurance Co. v. Hartford Insurance Co.*, 1998 WL 230936
(S.D.N.Y. May 8, 1998) involved an insurer suing a co-insurer for
reimbursement of payments to the insured that were covered under
defendant insurer's policy but not plaintiff's, *id.* at *1, but the
court never so much as used the term "indemnification." Nor did the
court address the elements of a claim for common law indemnification

or confront an argument that New York law did not recognize the claim as pleaded.

Beazley also cites a case in which AIG reimbursed an insured roughly $4 million under a theft insurance policy, while defendant-insurer disclaimed coverage. *Luvata Buffalo, Inc. v. Lombard Gen. Ins. Co. of Canada*, 2010 WL 826583, at *1 (W.D.N.Y. March 4, 2010), *report and recommendation adopted sub nom. Luvata Buffalo, Inc. v. AIG Europe, S.A.*, 2010 WL 1292301 (W.D.N.Y. Mar. 29, 2010). AIG sought indemnification from defendant-insurer for its failure to reimburse or indemnify it for any portion of insured's loss, arguing that defendant was the primary insurer for the loss and that AIG was the excess insurer. 2010 WL 826583, at *2-3. The court held that "[w]hether AIG and Lombard are considered co-primary insurers of the loss, or whether AIG is considered to provide excess coverage to Lombard's primary policy for this loss, AIG has standing to seek indemnification against Lombard." *Id.* at *3. However, the cases the court cited in support of that holding were recognizing a cause of action for contribution between co-insurers that were liable for the same loss. *Id.* The case is further distinguishable because AIG did not argue that its policy did not cover the loss at issue *per se*, but rather that its coverage was excess of a primary insurer's that had wrongfully disclaimed coverage. Thus, *Luvata* is inapposite, and the Court finds that New York law does not recognize a cause of action at common law for "indemnification" between insurers under

20

these circumstances. As such, Beazley's third cause of action is
dismissed.

Beazley's position, as noted, is "that it has no obligation to
[NASDAQ] under the Beazley Policy in connection with the CAC."
Compl. ¶ 64. However, with its fourth case of action for
contribution, Beazley contends that "in the alternative . . .
Beazley and the Defendants insured the same risk [such] that they
both are obligated to pay defense costs and indemnify the NASDAQ
Parties in connection with the CAC." *Id.*

Under New York law, "when several insurers cover the same risk
and payment for loss has been made by one, that carrier has a right
to pro rata contribution from other insurers." *State of N.Y. v.
Blank*, 27 F.3d 783, 793 (2d Cir. 1994) (citation omitted), *abrogated
on other grounds by Ment Bros. Iron Works Co. v. Interstate Fire &
Cas. Co.*, 702 F.3d 118, 121-22 (2d Cir. 2012). Defendants argue that
they do not insure NASDAQ against the "same risk" as Beazley does,
because Beazley provides NASDAQ with E&O coverage while defendants
provide NASDAQ with D&O coverage. Moreover, ACE adds, Beazley
provides NASDAQ with *excess*-layer coverage while ACE provide NASDAQ
with *primary* coverage.

The Court agrees with Beazley that both insurance policies need
only be triggered by the same underlying event or action in order
for a claim for contribution to lie. In *National Casualty Co. v.
Vigilant Insurance Co.*, 466 F. Supp. 2d 533 (S.D.N.Y. 2006),
defendant-insurer similarly argued that plaintiff-insurer's policy

did not insure against the "same risk" as defendant's because defendant-insurer had a duty to defend while plaintiff-insurer had a duty to reimburse for defense costs. *Id.* at 540-41. Moreover, plaintiff-insurer's policy covered "publishing and advertising liability," while defendant-insurer's policy covered directors' and officers' liability. *Id.* at 537. The court rejected the defendant's argument, however, holding that "[t]o the extent the 'same risk' requirement applies at all in the context of defense obligations, it requires only that both policies be triggered by the same underlying lawsuit." *Id.* at 541; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hartford Ins. Co. of Midwest*, 248 A.D.2d 78, 84 (N.Y. App. Div. 1st Dep't 1998) ("The fact that the Hartford policy was a commercial general liability policy, much broader than National Union's, does not establish that the policies did not insure the same risk.").

Significantly, such a rule serves the purposes of contribution, which is "is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." *Everest Nat. Ins. Co. v. Evanston Ins. Co.*, 2011 WL 534007, at *4 (D. Nev. Feb. 8, 2011). If both the E&O policies and the D&O policies are triggered by the Facebook Class Action, it would confer a windfall on defendants to

allow them to escape pro rata contribution simply because their policies are triggered for different reasons.[13]

As for ACE's argument that it insures a different level of risk than Beazley, the cases it relies on are inapt. *United States Fidelity & Guaranty. Co. v. American Re-Insurance Co.*, 20 N.Y.3d 407 (2013) involved the interpretation of an "other insurance" clause and had nothing to do with whether insurers at different levels of risk are immunized from contribution to one another. The others involved the issue of whether an excess insurer was required to contribute prior to the exhaustion of a lower-level policy and related issues of priority between insurers. *See Philadelphia Indem. Ins. Co. v. Emp'rs Ins. Co. of Wausau*, 318 F. Supp. 2d 170, 173 (S.D.N.Y. 2004) ("[T]he cases that recognize an exception to the rule of ratable contribution [under New York law] . . . concern how to effectuate excess clauses that disclose an intent to trump other, merely general, excess clauses."). While Beazley may or may not ultimately be entitled to contribution, its contribution claim is adequately pleaded.

---

[13] Admittedly, defendants' position that their policies do not cover the "same risk" as the E&O policies has some surface appeal given that the E&O policies cover risk "solely in rendering or failing to render Professional Services," while the D&O policies *preclude* coverage for any claim "by or on behalf of a customer or client of [NASDAQ] . . . arising out of, or attributable to the rendering or failure to render professional services." The policies need not be mutually exclusive, however. If a claim were brought against NASDAQ by a non-customer or non-client arising out of the rendering of or failure to render "professional services" -- within the meaning of both the E&O and D&O policies -- such a claim would be covered by both Beazley's and defendants' policies.

The Court also rejects defendants' attempt to dismiss Beazley's fifth cause of action for breach of contract in its capacity as an assignee of NASDAQ's contractual rights against defendants.

Defendants first argue in this regard that the ACE D&O Policy's "anti-assignment" clause renders NASDAQ's assignment of its rights to Beazley invalid. That clause provides that "[n]o . . . assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by an authorized representative of the Insurer." Compl., Ex. D, § XXIII. However, it is well settled under New York law that anti-assignment clauses do not prevent an insured from assigning its rights after a claim has accrued. *See Tenneco Chems., Inc. v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 1977 U.S. Dist. LEXIS 16759, at *7 (S.D.N.Y. Mar. 23, 1977) (holding that "[s]uch clauses do not apply to an assignment of an insurance claim after the loss has occurred" because "[t]he purpose of such provisions is to protect the insurer from any added risks in the event the policy is assigned to a less cautious entity"). To the extent policies purport to limit post-loss assignments, "such assignments are contrary to the public policy of New York." *Id.* at *8.

ACE contends, without citation to any pertinent authority, that NASDAQ's assignment of its rights to Beazley was a *pre-loss* assignment because the settlement of the Facebook Class Action had not received final court approval at the time Beazley filed this action. The Court disagrees, as to so hold would disregard the

24

policy animating the distinction New York courts draw between

invalid pre-loss assignments and valid post-loss assignments in the

insurance context. As the Second Circuit has explained:

> An assignment could alter drastically the insurer's
> exposure depending on the nature of the new
> [policyholder]. "No assignment" clauses protect against
> any such unforeseen risk. When the loss occurs before the
> transfer, however, the characteristics of the [assignee]
> are of little importance: regardless of any transfer the
> insurer still covers only the risk it evaluated when it
> wrote the policy.

*Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 171 (2d

Cir. 2006) (quoting *Northern Ins. Co. of N.Y. v. Allied Mut. Ins.*

*Co.*, 955 F.2d 1353, 1358 (9th Cir. 1992)).

Here, the Facebook Class Action was brought against NASDAQ

prior to NASDAQ's assignment of its rights against ACE and INIC to

Beazley. The Court fails to see how the assignment in any way

affected the value of the claims in the CAC or how defendants are

prejudiced by it. Indeed, NASDAQ assigned its rights to Beazley in

connection with the settlement reached in the Facebook Class Action

on April 22, 2015. *See* Compl. ¶ 5. Thus, ACE and INIC "still cover[]

only the risk [they] evaluated when [they] wrote the policy."

*Globecon Grp.*, 434 F.3d at 171.[14] Under such circumstances, there is

---

[14] Perplexingly, INIC appears to argue that NASDAQ's assignment of
rights to Beazley somehow requires INIC to insure against claims
arising under the E&O policies and thereby "imposes new and
increased risks upon the D&O insurers." INIC Opening Br. at 13. To
the contrary, Beazley pleads that NASDAQ assigned its claims against
defendants under the D&O policies to Beazley. It would make no sense
for NASDAQ to have assigned its claims under the E&O policies to
Beazley.

no basis for treating the assignment at issue as a "pre-loss" assignment.

Next, ACE argues that the $2 million retention in the ACE D&O Policy constitutes a condition precedent to coverage that has not been satisfied, such that Beazley's breach of contract claim must fail. The relevant provision provides that, "the liability of [ACE] shall apply only to that part of Loss which is excess of the applicable Retention amount . . . . Such Retention shall be borne uninsured by the Insureds and at their own risk." Compl., Ex. D, § VIII. But this provision is not a condition precedent to coverage. That ACE is only liable for loss in excess of the retention does not mean that its liability only attaches upon payment of the retention. It would be perverse if an insurer could escape coverage because its insured had sensibly not paid a retention following the insurer's wrongful denial of coverage.

Finally, defendants contend that Beazley has failed to plead the elements of a breach of contract claim. "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *See Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (footnote omitted).

ACE contends that Beazley fails to allege the precise date, scope, or content of the purported assignment such that the Court can determine whether the assignment is valid and whether Beazley has standing to bring the claim. ACE cites no apposite case in

support of the proposition that Beazley need plead the assignment with such specificity to survive a motion to dismiss. In any case, the assignment is not the relevant contract at issue for purposes of the "contract" element of the claim. To the extent discovery reveals that the assignment of rights was somehow ineffective, defendants may pursue this argument on summary judgment.

INIC, for its part, argues that Beazley fails to identify a provision of the D&O policies that was breached, but this contention overlooks that Beazley's entire theory of the case is that defendants wrongfully denied coverage for covered claims under the D&O policies.

As to performance, ACE repackages its argument that NASDAQ failed to satisfy the retention under the ACE D&O Policy, which, according to ACE, is a condition precedent for coverage. This argument fails for the reasons stated above.

As to breach, ACE claims that Beazley has failed to plead breach because ACE has not breached. This circular argument is entirely dependent on the applicability of the ambiguous Professional Services exclusion, which the Court has already found to be an insufficient basis on which to dismiss the complaint at the pleadings stage. Moreover, it would appear ACE did breach its policy in light of its failure to advance defense costs to NASDAQ that the Court has now held it was obligated to advance.

As to damages, ACE contends that NASDAQ is being provided coverage by its E&O insurers and thus has no suffered no damages.

Beazley, as NASDAQ's assignee, cannot stand in a better position than its assignor, so if NASDAQ has no damages on a breach of contract claim against defendants, Beazley has no damages as its assignee. *See Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126 (1975). While Beazley's pleading in this regard is somewhat bare, it is certainly plausible that NASDAQ will not be made whole by its E&O insurers and, thus, has suffered damages as a result of the defendants' allegedly wrongful disclaimers of coverage. If discovery reveals that this is not the case, defendants may have a summary judgment argument; but the Court declines to dismiss the claim on this basis at this early stage.

In summary, for the foregoing reasons, the Court, by Order dated October 20, 2015, granted summary judgment against ACE on Count One, dismissed Count Three with prejudice, dismissed Counts Four and Five as against INIC (but not ACE) without prejudice, and otherwise denied defendants' motions to dismiss.

Dated:   New York, NY
         December 20, 2015                    JED S. RAKOFF, U.S.D.J.