UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
BEAZLEY INSURANCE COMPANY, INC.,          :
                                          :
                                          :    15-cv-5119 (JSR)
          Plaintiff,                      :
                                          :    OPINION AND ORDER
          -v-                             :
                                          :
ACE AMERICAN INSURANCE COMPANY, et al.,   :
                                          :
          Defendants.                     :
---------------------------------------x

JED S. RAKOFF, U.S.D.J.

     This dispute between three insurers of NASDAQ arises from a

class action suit (the "Facebook Class Action") that retail

investors in Facebook brought against NASDAQ in the aftermath of

Facebook's troubled initial public offering on the NASDAQ stock

exchange. While plaintiff Beazley Insurance Company, Inc.

("Beazley") agreed to contribute its full limit of liability to

NASDAQ's settlement of the Facebook Class Action, defendants ACE

American Insurance Company ("ACE") and Illinois National Insurance

Company ("INIC") disclaimed coverage. Beazley now moves for partial

summary judgment against ACE on its second cause of action seeking a

declaratory judgment that ACE is obligated to provide indemnity

coverage to NASDAQ in connection with the Facebook Class Action.

Conversely, ACE moves for summary judgment on all remaining claims

against it (Counts Two, Four, and Five) primarily on the basis that

the Facebook Class Action falls within the "professional services"

exclusion of the relevant policy. INIC likewise moves for summary

judgment on all remaining claims against it (i.e., Counts One and Two).

Because the Court finds that the Facebook Class Action's claims fall within the "professional services" exclusion, the Court denies Beazley's motion for summary judgment, grants ACE's motion for summary judgment on Counts Two and Four, and grants INIC's motion for summary judgment in its entirety. However, the Court denies ACE summary judgment on plaintiff's breach of contract claim (Count Five), since ACE breached its duty to advance defense costs to NASDAQ and since Beazley (in its capacity as NASDAQ's assignee) appears to have damages in the form of NASDAQ's unreimbursed attorneys' fees.

This litigation traces itself to a series of lawsuits filed against NASDAQ entities and officers in 2012 in connection with NASDAQ's alleged mishandling of the Facebook IPO. On October 4, 2012, the Judicial Panel on Multidistrict Litigation centralized 41 actions related to the Facebook IPO in the Southern District of New York before Judge Sweet, including eight actions brought against NASDAQ entities and officers alleging federal securities law and negligence claims. See In re Facebook, Inc., IPO Sec. & Derivative Litig., 899 F. Supp. 2d 1374, 1377 (J.P.M.L. 2012). Judge Sweet subsequently consolidated the NASDAQ actions separately for pretrial proceedings. See In re Facebook, Inc., IPO Sec. & Derivative Litig., 288 F.R.D. 26, 29-30 (S.D.N.Y. 2012).

On April 30, 2013, a consolidated amended class action complaint (the "CAC") was filed against NASDAQ OMX Group, Inc., NASDAQ Stock Market, LLC, Robert Greifeld (NASDAQ's President and CEO at the relevant time), and Anna Ewing (NASDAQ's Chief Information Officer at the relevant time) (collectively, the "NASDAQ Parties"), on behalf of a putative class of all persons "that entered pre-market and aftermarket orders to purchase and/or sell the common stock of Facebook Inc. . . . on May 18, 2012 . . . in connection with Facebook's initial public offering . . . and who thereby suffered monetary losses as a result of the [NASDAQ Parties'] wrongdoing." See Decl. of Kevin Kieffer in Support of Pl. Beazley Ins. Co., Inc.'s Mot. for Partial Summ. J. dated Jan. 15, 2016 ("Kieffer Decl. dated Jan. 15, 2016"), Ex. 2 at 1, ECF No. 74-2.

More specifically, the CAC was brought on behalf of both a "Securities Class" alleging violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and a "Negligence Class" alleging claims for common law negligence. See id. Among other things, the CAC alleged that "the wholesale breakdown in NASDAQ's trading platforms" on the day of the IPO "caused Class Members substantial damages by, inter alia: (i) causing erroneous and failed trade executions; (ii) blinding Class Members for hours — if not days — as to their then-current positions in Facebook stock due to late and/or missing trade confirmations; (iii) preventing Class Members from executing orders at the National Best Bid/Offer [] prices for

Facebook stock as required by SEC Reg. NMS; and (iv) exposing Class Members to related failures of the NASDAQ trading platform, resulting in, among other things, an artificial downward pressure on the price of Facebook's stock." Id. ¶ 15.

During the relevant time period, NASDAQ OMX Group, Inc. maintained both an errors and omissions ("E&O") insurance policy and a directors and officers ("D&O") insurance policy — both of which were potentially implicated by the CAC. Non-party Chartis Specialty Insurance Company ("Chartis") was NASDAQ's primary E&O liability insurer at the relevant time, having issued NASDAQ OMX Group, Inc. a policy for the policy period of January 31, 2012 through January 31, 2013 (the "Chartis E&O Policy"). See Defs.' Joint Statement of Undisputed Material Facts ("Defs.' Rule 56.1 Stmt.") ¶ 8, ECF No. 71.[1] Beazley was NASDAQ's first-layer excess E&O insurer, having issued a policy to NASDAQ OMX Group, Inc. for the same policy period (the "Beazley E&O Policy"). See id. ¶ 12. The Beazley E&O Policy follows the form of the Chartis E&O Policy — meaning that it generally insures the same risks under the same set of terms and conditions as the Chartis E&O Policy — and sits in excess of the Chartis E&O Policy's $15 million limit of liability. As a "first-layer excess" insurer, Beazley's $15 million limit of liability was

---

[1] All citations to facts set forth in a party's Local Rule 56.1 Statement are citations to facts that were admitted in relevant part by the opposing party, unless otherwise noted.

implicated once Chartis's $15 million limit of liability was exhausted. See id. ¶ 13.

ACE, for its part, was NASDAQ's primary D&O liability insurer at the relevant time, having issued a policy to NASDAQ OMX Group, Inc. for the policy period of January 31, 2013 to January 31, 2014 (the "ACE D&O Policy").[2] See id. ¶ 16. INIC was NASDAQ's first-layer excess D&O insurer, having issued a policy to NASDAQ OMX Group, Inc. for the same policy period with a $15 million limit of liability (the "INIC D&O Policy"). See id. ¶¶ 19-20. The INIC D&O Policy follows the form of the ACE D&O Policy and sits in excess of the ACE D&O Policy's $15 million limit of liability. See id. ¶¶ 17, 21-22.

The E&O policies provided NASDAQ with coverage, in relevant part, for "Damages resulting from any Claim . . . for any Wrongful Act . . . solely in rendering or failing to render Professional Services." Compl., Ex. C, § l.I, ECF No. 2-3. Upon receiving notice of various of the underlying actions brought against NASDAQ, Chartis issued a reservation of rights letter and agreed to advance defense costs to NASDAQ under the Chartis E&O Policy. See Aff. in Support of Def.'s Mot. for Summ. J. ("London Aff."), Ex. L, ECF No. 66-8. Beazley similarly accepted potential coverage under its E&O policy, subject to a reservation of rights. See Decl. of Carrie Parikh in

---

[2] Although the actions that ultimately formed the consolidated Facebook Class Action were first brought prior to the beginning of the policy period, ACE acknowledged in an October 8, 2013 letter to NASDAQ that the Facebook Class Action qualified as a "Prior Covered Claim" under the ACE D&O Policy. See Compl., Ex. F at 2, ECF No. 2-6.

Support of Pl. Beazley Ins. Co., Inc.'s Mot. for Partial Summ. J. dated Jan. 15, 2016 ("Parikh Decl. dated Jan. 15, 2016") ¶ 2, ECF No. 75. ACE, however, disclaimed coverage, relying primarily on the "professional services" exclusion. See Def.'s Rule 56.1 Stmt. ¶ 46.

In April 2015, the NASDAQ Parties agreed to settle the Facebook Class Action for $26.5 million. See Parikh Decl. dated Jan. 15, 2016 ¶ 5. In connection with that settlement and in exchange for a mutual release of claims, Beazley entered into an agreement with the NASDAQ Parties dated June 15, 2015, by which Beazley agreed to contribute its full $15 million limit of liability toward the settlement and by which the NASDAQ Parties "assign[ed] to Beazley any and all contractual rights or extra-contractual rights they have or that they may acquire . . . against ACE and/or Illinois National in connection with the [Facebook Class Action] up to the amount of [$15 million]." Kieffer Decl. dated Jan. 15, 2016 ¶ 20; see also Decl. of Carrie Parikh in Opp. to ACE Am. Ins. Co.'s and Ill. Nat'l Ins. Co.'s Mots. for Summ. J. dated Jan. 29, 2016 ¶ 6, ECF No. 86. Shortly thereafter, on June 30, 2015, Beazley initiated this action against ACE and INIC.

Beazley subsequently moved for partial summary judgment on Count One, seeking a declaratory judgment that ACE was obligated under the ACE D&O Policy to cover NASDAQ's defense costs in connection with the Facebook Class Action. Simultaneously, ACE and INIC both moved to dismiss the complaint in its entirety. On October 21, 2015, the Court granted Beazley partial summary judgment on

Count One and granted in part and denied in part defendants' motions to dismiss. Specifically, the Court dismissed Count Three (for indemnification) as against both defendants with prejudice; dismissed Count Four (for contribution) and Count Five (for breach of contract) as against INIC without prejudice; and otherwise denied defendants' motions to dismiss. See Beazley Ins. Co. v. Ace Am. Ins. Co., 2015 WL 6442224, at *1-2 (S.D.N.Y. Oct. 21, 2015). The Court explained these rulings in an opinion issued on December 20, 2015, in which it found, based on the arguments then before it, that ACE had not yet met its heavy burden of demonstrating that the "professional services" exclusion unambiguously applied to the CAC's claims such that ACE could avoid its duty to advance defense costs to NASDAQ. See Beazley Ins. Co. v. Ace Am. Ins. Co., 2015 WL 9267199, at *5 (S.D.N.Y. Dec. 20, 2015).

Turning to the parties' pending motions for summary judgment, the critical issue remains the applicability of the "professional services" exclusion found in the ACE D&O Policy to the claims in the Facebook Class Action. That exclusion provides as follows:

> The Insurer shall not be liable for that portion of Loss on account of any Claim: . . . by or on behalf of a customer or client of the Company [i.e., NASDAQ], alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services.

London Aff., Ex. F § III (as amended by Endorsement Nos. 10 and 19), ECF No. 66-2.[3]

Neither "customer or client" nor "professional services" is defined in the ACE D&O Policy. Beazley's argument that defendants have wrongfully invoked this policy exclusion is two-pronged. First, Beazley argues that the class of retail investors who brought and settled the Facebook Class Action are not "customer[s] or client[s]" of NASDAQ, as is required to trigger the exclusion.[4] Rather, argues Beazley, NASDAQ's customers are its members — that is, the market makers through which retail investors may buy and sell stock listed on the NASDAQ stock exchange — and the listing companies themselves (e.g., Facebook). Second, Beazley argues that the settled claims in the CAC are not "alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services." ACE, conversely, submits that retail investors are "customer[s] or client[s]" of NASDAQ and that the settled claims

---

[3] Though many capitalized terms in the relevant policies appear in boldface, the Court has not replicated that formatting in this Opinion and Order, as it is immaterial to the contractual analysis.

[4] On November 9, 2015, Judge Sweet issued an Order and Final Judgment approving the settlement of the Facebook Class Action. See Kieffer Decl. dated Jan. 15, 2016, Ex. 20, ECF No. 74-20. The Order and Final Judgment certified a settlement class of "all persons and entities that entered retail pre-market and aftermarket orders to purchase and/or sell the common stock of Facebook, Inc. on May 18, 2012, and who suffered monetary losses as a result of the conduct alleged in the CAC," and expressly excluded "any person or entity that was on May 18, 2012 a member of the Exchange." Id. ¶ 3. In other words, the settlement class was composed exclusively of retail investors in Facebook.

arose out of "professional services" as a matter of law. For ACE to prevail, it must be right on both counts.

As the parties agree, the insurance contracts here in issue are governed by New York state law.[5] Under well-settled New York law, "[w]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language." Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co., 12 N.Y.3d 302, 307 (2009) (quoting Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 311 (1984)) (internal quotation mark omitted). Policy exclusions "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." Id. To avoid coverage on the basis of a policy exclusion, an insurer thus bears the burden of establishing that the exclusion is "subject to no other reasonable interpretation." Id. This rule "is merely a specific, heightened application of contra proferentem," the principle by which ambiguities in an insurance contract are construed against the insurer. Sea Ins. Co. v. Westchester Fire Ins. Co., 51 F.3d 22, 26 n. 4 (2d Cir. 1995). And "contra proferentem does not come into play unless this court first determines that the contract is, in fact, ambiguous." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001).

---

[5] "[W]here the parties agree that New York law controls," as is the case in this diversity action, "this is sufficient to establish choice of law." Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 566 (2d Cir. 2011).

Whether a contract term is ambiguous is assessed from the perspective of a "reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 87 n.4 (2d Cir. 2002) (internal quotation marks omitted) (holding that district court "erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed"); see also Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 180 (2d Cir. 2014) ("Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance."). Thus, evidence of custom and usage is properly considered prior to the evaluation of extrinsic evidence. In addition, "contracting parties operate against the backdrop not only of state law, but of federal law as well. And when federal law concepts . . . are employed, the parties may be read as having incorporated established meanings and definitions forged in the relevant federal cases." Hugo Boss, 252 F.3d at 618 (finding that undefined term in a policy exclusion was sufficiently established in the federal case law such that the exclusion unambiguously applied).

Against the backdrop of these governing principles, the first issue for the Court is whether retail investors in a company (here, Facebook) listed on a stock exchange (here, NASDAQ) are

10

unambiguously "customer[s] or client[s]" of the exchange.[6] Custom and usage — particularly usage in the context of federal securities case law — establishes that they are.

Most significantly, in Lank v. New York Stock Exch., 548 F.2d 61 (2d Cir. 1977), the Second Circuit observed that "[t]he primary purpose of the Exchange Act was to protect customers of the stock exchanges that is, public investors" and explained that this purpose was effectuated through, inter alia, the imposition of a statutory duty on exchanges to regulate their members. Id. at 64 (emphasis added). Along the same lines, district courts across the country have repeatedly identified retail investors as "customers" of stock exchanges, clearly distinguishing between members of the exchange and customers of the exchange. See Matter of Lake States Commodities, Inc., 936 F. Supp. 1461, 1469 (N.D. Ill. 1996) ("[T]he Second Circuit [has] construed the NYSE constitution and rules as intending to provide customers of the exchange with the right to

---

[6] On first glance, it might seem as though this issue was already resolved by the Court's December 20 Opinion, in which the Court found that because "interpreting 'customer[s] or client[s]' to exclude retail investors in a public company listed on NASDAQ is at least one reasonable interpretation of the ACE D&O Policy," ACE had a duty to advance defense costs to NASDAQ under its D&O Policy. Beazley Ins. Co., 2015 WL 9267199, at *5. But, as the Court also made clear in its December 20 Opinion, "[d]efendants [would be] free, with the benefit of discovery, to renew their arguments as to the meaning of 'customers or clients' on summary judgment." Id. at *5 n.9. Taking advantage of the framework provided by discovery and by the rules of summary judgment practice, ACE has now done so — raising more compelling arguments this time around — and so the issue of whether "customer or client" is ambiguous warrants a fresh look in this new context.

force members into arbitration over disputes." (emphasis added)),
abrogated on other grounds by Damato v. Hermanson, 153 F.3d 464 (7th
Cir. 1998); Carr v. New York Stock Exch., Inc., 414 F. Supp. 1292,
1298 (N.D. Cal. 1976) ("In enforcing its rules and in making complex
decisions on the suspension or forced liquidation of members, the
Exchange must consider the often conflicting interests of the member
firm, its partners, and investors, and the corporations whose
securities are handled by the firm, as well as the Exchange's public
customers." (emphasis added)); Moses v. Burgin, 316 F. Supp. 31, 57
(D. Mass. 1970) ("[A]n anti-rebate rule is the type of stock
exchange rule which has the force of law and is binding alike upon
members and customers of the exchange." (emphasis added)), rev'd in
part on other grounds, 445 F.2d 369 (1st Cir. 1971); New York Stock
Exch., Inc. v. Sloan, 1980 WL 1431, at *3 (S.D.N.Y. Aug. 15, 1980)
("[The New York Stock Exchange's] right to relief is predicated upon
its subrogation to the rights of its customers."). In fact, with the
benefit of summary judgment briefing, it now appears that this usage
is uniform and consistent.[7]

---

[7] Beazley argues that the district court in Sloan was using
"customers" to refer to customers of member firms, rather than the
exchange itself. While that is true of some of the references to
"customers" in Sloan, the district court also clearly referred to
public investors as "customers" of the New York Stock Exchange, as
in the parenthetically quoted language above. Beazley is correct,
however, that ACE's reliance on Lehman Bros. Inc. v. Certified
Reporting Co., 939 F. Supp. 1333 (N.D. Ill. 1996), is misplaced. The
court there was analyzing whether the plaintiffs were "customers" of
the exchange's members, not the stock exchange to which the members
belonged. See id. at 1340-41.

Beazley tries to dismiss this case law as merely using the term "customer" in passing, such that the Court should give it little weight. The Second Circuit's reference to public investors as "customers" of a stock exchange, Beazley asserts, "was no more than an offhand remark." Beazley Ins. Co., Inc.'s Opp. Br. in Response to ACE Am. Ins. Co.'s Mot. for Summ. J. ("Beazley Opp.") at 9, ECF No. 82. In fact, however, the Lank Court's observation that the Exchange Act was designed to protect public customers of stock exchanges was, far from being an "offhand remark," critical to the court's holding that members of stock exchanges cannot sue exchanges under § 6 of the Exchange Act because members of stock exchanges are not "within the class the statute is intended to protect." Lank, 548 F.2d at 65; see also Carr, 414 F. Supp. at 1297-98 ("Defendants contend that . . . Congress intended [§ 6] to protect only the public customers of the Exchange and not private investors in the brokerage houses themselves. . . . Subsequent cases have extended the scope of the implied right of action beyond the public customers of an exchange.").

The Second Circuit's reasoning in Hugo Boss also undermines Beazley's argument. There, the Second Circuit held that the meaning of the undefined term "trademarked slogan" in a policy exclusion was sufficiently clear in the federal case law so as to render the term unambiguous as used in the policy exclusion. Hugo Boss, 252 F.3d at 618-20. In particular, the Second Circuit found that the federal case law establishes that a "trademarked slogan" is a "phrase[] used

13

to promote or advertise a house mark or product mark, in
contradistinction to the house or product mark itself." Id. at 618
(emphasis in original). Notably, in reaching this conclusion, the
Second Circuit relied primarily on cases in which the meaning of
"trademarked slogan" was not squarely at issue. See, e.g., Blau
Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609-11 (7th
Cir. 1986) (holding that a "location box" in an advertisement was
descriptive and lacked secondary meaning); Nike, Inc. v. Just Did It
Enters., 6 F.3d 1225, 1233 (7th Cir. 1993) (reversing grant of
summary judgment because whether parody of Nike's trademarks created
a likelihood of confusion was genuinely disputed). Indeed, the
Second Circuit found significant that most federal courts had taken
the meaning of "trademarked slogan" "as a given." Hugo Boss, 252
F.3d at 619. So too here, numerous courts have taken it "as a given"
that retail investors are "customers" of stock exchanges.[8]

Finally, Beazley's argument that there is no indication that
the parties intended to incorporate the usage of federal law misses
the point. As noted, because "contracting parties operate against
the backdrop . . . of federal law," and because concepts of federal
securities law are inherently employed when contracting parties make
reference to a national stock exchange's "customers" in an insurance

---

[8] Beazley also tries to distinguish these cases by pointing out that
none of them concerned NASDAQ — which operates differently from a
traditional, brick-and-mortar exchange — but fails to explain why
that distinction is relevant.

policy that covers "Securities Claims,"[9] the parties are presumed to
have incorporated the "established meanings and definitions forged
in the relevant federal cases." Id. at 618 (emphasis omitted). This
presumption governs the interpretation of the contract "unless [the
parties] expressly indicate otherwise." Id. at 620. The parties did
not "expressly indicate otherwise," and the federal case law
establishes that "customers," as that term is used in the policy
exclusion, unambiguously encompasses retail investors.

   This conclusion is sufficient to end the inquiry into the
meaning of "customers" as that term is used in the policy exclusion.
But even if it were not, compelling evidence of industry usage — now
before the Court as part of the summary judgment record — reinforces
and confirms the Court's conclusion. As ACE recounts, on May 10,
2012, NASDAQ's Chief Information Officer (Anna Ewing, a named
defendant in the Facebook Class Action) made the following statement
to analysts: "We process billions of transactions in a day at sub-
microsecond speeds to millions of customers." Defs.' Rule 56.1 Stmt.
¶ 6 (emphasis added). In referring to "millions of customers," Ewing
was plainly referring to retail investors.[10] In the same vein, when

_____

[9] The ACE D&O Policy defines "Securities Claim" as, inter alia, "any
Claim . . . alleging a violation of any federal . . . rule or
statute . . . regulating securities." London Aff., Ex. F, § II.O.2
(as amended by Endorsement No. 12).

[10] Beazley's suggestion that Ewing was not necessarily referring to
NASDAQ's customers is unpersuasive. The fact that Ewing also used
the term "customers" to refer to non-investors on the same call is
irrelevant, as defendants have never contended that public investors
are the only customers or clients that NASDAQ has. In addition,
contrary to Beazley's assertion, Ewing's statement is not hearsay

the Chicago Mercantile Exchange launched its S&P Dow Jones Indices in 2012, its Executive Chairman and President Terry Duffy noted that "this new [joint venture] . . . will create new risk management index products and trading opportunities for both our institutional and retail customers around the world." Id. ¶ 94.[11]

Moreover, there are numerous allegations in the CAC itself in which the class members (i.e., retail investors in Facebook) are referred to as NASDAQ's "customers" or "customer base." See, e.g., Kieffer Decl. dated Jan. 15, 2016, Ex. 2, ¶ 8 ("NASDAQ's trading platforms and system failures directly prevented the majority of NASDAQ's customer base from knowing their true positions in Facebook . . . ." (emphasis added)); id. ¶ 133 ("Defendants . . . put their own business interests ahead of the interests of NASDAQ's customers and members . . . ." (emphasis added)); id. ¶ 216 ("[T]he majority of NASDAQ's customers were forced to carry significant positions in Facebook over the weekend . . . ." (emphasis added)). While the fact that the CAC alleges that the class members are "customers" of

---

because it is not being offered for the truth of the matter asserted.

[11] Beazley submits that Duffy's reference to "retail customers" could "easily mean customers that provide services to retail investors, rather than the retail investors themselves." Beazley Opp. at 12. But, as with Beazley's proposed reading of Ewing's comment, this interpretation unreasonably strains the statement without any basis for doing so. And, as with Ewing's statement, Duffy's remark is not hearsay because it is not being offered for the truth of the matter asserted.

NASDAQ does not make it so, the class members' self-identification
as "customers" of NASDAQ is notable.[12]

Beazley, for its part, relies heavily, as it did in earlier
motion practice, on the rule change proposal NASDAQ submitted to the
SEC in July 2012. In that proposal, known as the "Accommodation
Plan," NASDAQ sought to modify Nasdaq Rule 4626 to allow its members
to submit claims for losses resulting from the error-ridden Facebook
IPO that the members in turn could use to compensate retail
investors. See Kieffer Decl. dated Jan. 15, 2016, Ex. 10, ECF No.
74-10. Absent the modification, NASDAQ explained, its members would
be limited to a $500,000 recovery, as opposed to the $62 million
available under the rule change, leaving retail investors without
meaningful recompense from NASDAQ. See id. at 45707. In its
proposal, NASDAQ also stated that "Nasdaq's business and legal
relationships are with its members, not its members' customers.
Nasdaq has no contractual or other relationships with its members'
customers, and generally does not possess information about
interactions between a member and its customer that may underlie
members' trading activity." Id. at 45712.[13]

---

[12] Beazley's contention that the CAC uses the terms "customers" and
"customer base" to refer to NASDAQ's member firms and not retail
investors is belied by the CAC's allegation that "Defendants . . .
put their own business interests ahead of the interests of NASDAQ's
customers and members." Kieffer Decl. dated Jan. 15, 2016, Ex. 2,
¶ 133. Such an allegation would be inexplicably redundant if
Beazley's reading were correct.

[13] NASDAQ made similar statements in its briefing in the Facebook
Class Action asserting, for example, that it has "no direct
relationship at all with non-member investors," in seeking to avoid

In Beazley's view, these statements demonstrate that NASDAQ does not view retail investors as "customers" of the exchange, or at least create an ambiguity as to the meaning of "customer" in the "professional services" exclusion. The fact that retail investors are "customers" of NASDAQ's members, however, as is undisputed, does not preclude retail investors from also being "customers" of NASDAQ. To be sure, NASDAQ's disclaiming any "relationship" with its members' customers is arguably in tension with the aforementioned evidence of industry usage. But positions taken by NASDAQ against the backdrop of litigation are not nearly as probative of meaning and usage as statements made free of such considerations. Cf. House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co., 775 F. Supp. 2d 302, 316 (D. Mass. 2011) ("[W]hen statements are made for the purposes of litigation, the potential motivation of the [speaker] undermines the statements' trustworthiness.").[14]

Taking all the foregoing evidence of usage together, the Court concludes that a "reasonably intelligent person . . . who is

---

liability to retail investors. Kieffer Decl. dated Jan. 15, 2016, Ex. 18 at 22, ECF No. 74-18.

[14] In its discussion of extrinsic evidence, Beazley also points to two successive "Computer Crime" insurance policies issued by ACE to NASDAQ in which "customer" and "client" are defined to cover specific entities with specific types of "written agreements" with NASDAQ. See Decl. of Kevin Kieffer in Opp. to Ace Am. Ins. Co.'s and Ill. Nat'l Ins. Co.'s Mots. for Summ J. dated Jan. 29, 2016, Exs. V, W (filed under seal). The narrow definitions of these terms in policies insuring against such entirely different risks are simply not relevant to the interpretation of "customer or client" in the "professional services" exclusion.

cognizant of the customs, practices, usages and terminology as generally understood in the [industry]" would understand "customers," as that term is used in the "professional services" exclusion, to unambiguously encompass retail investors. Int'l Multifoods Corp., 309 F.3d at 87 n.4. Accordingly, the first prong of the exclusion is satisfied.[15]

Because the Court finds no genuine ambiguity, it need not evaluate the parties' extrinsic evidence of the contracting parties' intent. However, the Court notes that Beazley misapprehends the law in suggesting that if the Court were to find an ambiguity, then the Court could enter summary judgment in Beazley's favor without resort to extrinsic evidence. To the contrary, the Second Circuit has "made clear that under New York law, courts should not resort to con[t]ra proferentum until after consideration of extrinsic evidence," including in the context of interpreting a policy exclusion. See, e.g., id. at 88 n.7; see also Hastings Dev., LLC v. Evanston Ins. Co., 141 F. Supp. 3d 203, 216-17 (E.D.N.Y. 2015) (evaluating parties' extrinsic evidence after finding policy exclusion to be ambiguous).

For the "professional services" exclusion to apply, ACE must also demonstrate that the CAC's claims were "alleging, based upon, arising out of, or attributable to the rendering or failure to

---

[15] Given its conclusion, the Court need not reach ACE's secondary argument that retail investors are also "clients" of NASDAQ within the meaning of the "professional services" exclusion.

render professional services" as a matter of law. London Aff., Ex. F § III (as amended by Endorsement No. 10). Under New York law, whether a given claim "arises out of" or is "based upon" excluded conduct in a policy exclusion (here, the rendering of or failure to render professional services) turns on whether the claim could succeed but for the excluded conduct. See Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd., 88 N.Y.2d 347, 350 (1996) ("[I]f no cause of action would exist but for the [excluded conduct], the claim is based on [the excluded conduct] and the exclusion applies"); Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd., 93 F.3d 63, 66 (2d Cir. 1996) (per curiam) ("Because [the plaintiff in the underlying suit] would be unable to maintain claims for negligent supervision, maintenance, and control 'but for' the assault upon her, under New York law her claims are 'based on' assault and battery and therefore excluded from coverage under the insurance policy."); Hugo Boss, 252 F.3d at 623 n.15 (applying "but for" test to breach of contract policy exclusion); Scottsdale Indem. Co. v. Beckerman, 992 N.Y.S.2d 117, 121 (2d Dep't 2014) (holding that a "'but-for' test applies to determine the applicability of an 'arising out of' exclusion," such that if "none of the causes of action that [the underlying plaintiff] asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to defend the action"); Lowy v. Travelers Prop. and Cas. Co., 2000 WL 526702, at *4 (S.D.N.Y. May 2, 2000) ("In insurance policy exclusion

clauses, the phrases 'arising under' and 'based on' mean 'but for.'").

In construing an exclusion for "professional services," courts "[look] to the nature of the conduct under scrutiny rather than the title or position of those involved, as well as to the underlying complaint." David Lerner Assocs. v. Phila. Indem. Ins. Co., 934 F. Supp. 2d 533, 541 (E.D.N.Y. 2013) (internal quotation mark and citation omitted). "[T]he question of whether one is engaged in a professional service depends on whether those individuals 'acted with the special acumen and training of professionals when they engaged in the acts . . . .'" Id. (citation omitted).

As a threshold matter, Beazley does not dispute that the design and operation of NASDAQ's systems require the "special acumen and training of professionals," such that these activities constitute professional services. Id. By the same token, Beazley does not contend that the negligence claims brought in the CAC do not arise out of the rendering or failure to render professional services. That is for good reason, as those claims were explicitly premised on, inter alia, NASDAQ's "fail[ure] to use reasonable care in the design, testing, and implementation" of its systems in connection with the Facebook IPO. Kieffer Decl. dated Jan. 15, 2016, Ex. 2, ¶ 363.

Instead, the parties focus on whether the CAC's federal securities claims, which were brought under §§ 10(b) and 20(a) of the Exchange Act, were "alleging, based upon, arising out of, or

attributable to the rendering or failure to render professional services." Beazley, relying exclusively on out-of-state authority, contends that the material misstatements and omissions that underlie the federal securities claims were essentially advertisements promoting NASDAQ's services, which do not constitute "professional services."[16] In particular, Beazley relies heavily on Rob Levine & Associates v. Travelers Casualty & Surety Co. of America, 994 F. Supp. 2d 228 (D.R.I. 2014), in which the district court for the District of Rhode Island held that a claim filed against a law firm for alleged deceptive advertising under Rhode Island's Unfair Trade Practice and Consumer Protection Act was covered by the law firm's insurance policy and not within the scope of the policy's professional services exclusion. See id. at 233. This was the case because, inter alia, the claim was "about advertising, not about the provision of legal services." Id. Beazley cites several other out-of-state cases for the same proposition. See, e.g., Standard Mut. Ins. Co. v. Lay, 2 N.E.3d 1253, 1259 (Ill. App. Ct. 2014) (holding that professional services exclusion did not apply because advertising was "ancillary to the performance of real estate services"); Westport Ins. Corp. v. Jackson Nat'l Life Ins. Co., 900 N.E.2d 377, 381 (Ill. App. Ct. 2008) ("The mere offer to perform a

---

[16] Though it is not relevant to the Court's analysis, Beazley's position is ironic given that the Chartis E&O Policy (which is incorporated by the Beazley E&O Policy) defines "Professional Services" to include "advertising" in connection with NASDAQ's market and exchange activities, regulatory activities, and non-regulatory activities. Compl., Ex. C, § 2(I), ECF No. 2-3 at 12.

professional service is not a professional service in its own
right.").

But, as noted, the relevant test under New York law is not
whether some of the NASDAQ Parties' alleged misstatements could be
characterized as "advertising,"[17] but rather whether the federal
securities claims could be maintained "but for" the excluded
conduct. Scottsdale Indem. Co., 992 N.Y.S.2d at 121. And, in this
case, the federal securities claims would have failed but for
NASDAQ's allegedly botched rendering of professional services.
Indeed, while material misrepresentations or omissions constitute
the heart of any § 10(b) securities fraud claim, economic loss and
loss causation are also critical elements of a § 10(b) claim. See
Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 807
(2011) ("To prevail on the merits in a private securities fraud
action, investors must demonstrate that the defendant's deceptive
conduct caused their claimed economic loss. This requirement is
commonly referred to as 'loss causation.'"). There is little
question that the CAC pleaded these elements by pointing to the
NASDAQ Parties' alleged failure to adequately render professional

_____

[17] Some of the alleged misstatements clearly were not
"advertisements" in any sense of the word. The CAC alleges a host of
misrepresentations on the day of the IPO pertaining to the extent of
the technical issues NASDAQ was experiencing. See Kieffer Decl.
dated Jan. 15, 2016, Ex. 2, ¶¶ 195-218. For example, the CAC
identifies the following message disseminated by NASDAQ on the day
of the IPO as a material misrepresentation: "NASDAQ is experiencing
a delay in delivering the opening print in Facebook, Inc. (FB).
NASDAQ will advise." Id. ¶ 197.

services. In pleading loss causation, for example, the CAC alleged
that:

> [D]amages [to the class members] were foreseeable and
> directly caused by the materialization of the concealed
> risks of Defendants NASDAQ, Greifeld and Ewing; namely,
> NASDAQ's technology and trading platform technical
> limitations and resulting failures, including the
> breakdown of its IPO Cross system, and Defendants' failure
> to properly test NASDAQ's systems prior to the IPO. The
> materialization of these risks occurred during the Class
> Period when NASDAQ's systems failed to: (i) properly
> execute Class Members' buy and sell pre-market Cross
> orders and aftermarket orders in Facebook's IPO; and (ii)
> failed to timely deliver confirmations of Class Members[']
> pre-market Cross orders, causing Class Members substantial
> damages.

Kieffer Decl. dated Jan. 15, 2016, Ex. 2, ¶ 238 (emphasis added).

For this reason, Beazley's contention that "a jury could have
found that NASDAQ had done everything it was required to do from a
technical standpoint, but nevertheless impose[d] liability based on
NASDAQ's alleged misrepresentations as to its abilities" is simply
wrong. Beazley Opp. at 22. If NASDAQ's systems had functioned
properly, the class would have had no damages and its claims would
have failed. Accordingly, the CAC's claims are "alleging, based
upon, arising out of, or attributable to the rendering or failure to
render professional services."[18] London Aff., Ex. F § III (as amended
by Endorsement No. 10).

---

[18] The same analysis applies to the CAC's § 20(a) control-person
claim, which requires proof of a primary violation of the federal
securities laws — in this case, § 10(b). See Kieffer Decl. dated
Jan. 15, 2016, Ex. 2, ¶¶ 343-44.

As for the out-of-state cases cited by Beazley, none applies New York law or the "but-for" test required by New York law.[19] The cases are not factually analogous, and even if they were, they would not be remotely binding on this Court.

Beazley argues against the "but-for" test as a policy matter, claiming that it would eviscerate the coverage afforded by the D&O policies. But Beazley fails to grapple with the fact that the applicability of the "but for" test to "arising out of" exclusions is well settled under New York law and cannot be disregarded by this Court on policy grounds. And even on its own terms, Beazley's policy argument is unpersuasive. As an initial matter, the "professional services" exclusion is limited only to claims brought by "customer[s] or client[s]" of NASDAQ. If a non-customer or non-client brought a claim against NASDAQ arising out of professional services, the exclusion would not apply. But even setting that aside, there are any number of common law and federal claims that could be maintained against NASDAQ that would not depend on a

---

[19] The district court in Rob Levine, for example, explains that under Rhode Island law "arising out of" means "flowing from" or "having its origin in." Rob Levine, 994 F. Supp. 2d at 232. The case is also inapposite because its conclusion was in large part premised on the observation that the advertisements at issue were not services "rendered" within the plain and ordinary meaning of that word. See id. at 233 ("This claim against [the insured] is about advertising, not about the provision of legal services: the advertisements were made to the general public before legal services are performed [in order] to market services. . . . Applying the Legal Practices Exclusion to this alleged deceptive advertising would ignore the meaning of the word 'rendering.'").

showing that professional services had been rendered or inadequately rendered.[20]

Accordingly, because the "professional services" exclusion unambiguously applies, the Court need not resort to contra proferentem and defendants have no duty to indemnify NASDAQ. The Court thus grants summary judgment on Count Two to both defendants.[21] The Court grants summary judgment to INIC on Count One for the same reason. Because the fate of Beazley's contribution claim (Count Four) against ACE is entirely dependent on whether the "professional services" exclusion applies, the Court grants summary judgment to ACE on that claim as well.

ACE also seeks summary judgment on Beazley's only remaining cause of action for breach of contract, brought in its capacity as NASDAQ's assignee. Because the "professional services" exclusion applies, the breach of contract claim fails to the extent it is based on ACE's failure to indemnify NASDAQ. However, in its October 21 Order and December 20 Opinion, the Court held that ACE breached its duty to advance defense costs to NASDAQ, which raises the

---

[20] Beazley also argues that the fact that the "professional services" exclusion is limited to "that portion of Loss on account of any [excluded] Claim" narrows the applicability of the exclusion. London Aff., Ex. F § III (as amended by Endorsement Nos. 10 and 19) (emphasis added). But because all of the CAC's claims fall within the "professional services" exclusion, all of the "Loss" is excluded. Beazley never attempts to explains what portion of the "Loss" would not arise out of the claims in the event the Court finds the policy exclusion to apply.

[21] Accordingly, the Court need not reach INIC's alternative arguments for summary judgment on Count Two.

question of whether Beazley might be entitled to recover any damages
for that breach.

Critically, the fact that the Court has now found that the
"professional services" exclusion unambiguously applies — on the
basis of the arguments presented to it on summary judgment — does
not mean that its prior holding that ACE had a duty to advance
defense costs is withdrawn. As an initial matter, it is well
established under New York law that "the insurer's duty to furnish a
defense is broader than its obligation to indemnify." Hugo Boss, 252
F.3d at 620 (internal quotation marks omitted); United Parcel Serv.
v. Lexington Ins. Grp., 983 F. Supp. 2d 258, 263 (S.D.N.Y. 2013)
("An insurer's duty to defend is 'exceedingly broad' — much broader
than the duty to indemnify.").[22] But, in any case, the Court reached
the conclusion that it did because defendants had failed to
demonstrate in the prior motion practice that "customer or client"
unambiguously encompasses retail investors in companies listed on
NASDAQ's exchange. They have now done so, but that does not
invalidate the prior holding.

Faced with an analogous set of circumstances in Hugo Boss, the
Second Circuit upheld the district court's determination that an
insurer had a duty to defend because, at the time that that question

---

[22] Defendants do not have a duty to defend under the D&O policies
but, rather, a duty to advance defense costs. However, "there is no
relevant difference between the allegations that trigger an
insurer's duty to defend and the allegations that trigger an
insurer's obligation to pay defense expenses." Lowy, 2000 WL 526702,
at *2 n.1.

was litigated, there was "legal uncertainty" as to the meaning of the relevant policy term. Hugo Boss, 252 F.3d at 622. It made no difference that the Second Circuit ultimately interpreted the policy term otherwise such that the insurer had no duty to indemnify. See id. at 622-23. As Judge Calabresi explained, "there are situations in which a legal uncertainty as to insurance coverage gives rise to (an at least temporary) duty to defend," and, in such cases, it is "incumbent upon [the insurer] to undertake a defense of [the insured] until the uncertainty surrounding the term [is] resolved." Id. at 622. Had ACE made the arguments in briefing its duty to advance defense costs that it makes now, the Court (even in the absence of the additional evidentiary items now before it) might have found that it had no such duty. ACE did not, and because the issue of whether the "professional services" exclusion applies was in doubt until the Court issued this Opinion and Order, ACE breached its contractual duty to advance defense costs.[23] See id. at 622-23 ("Had [the insurer] sought a declaratory judgment immediately upon [the insured's] filing of its insurance claim, a court might have eliminated th[e] [legal] uncertainty by reading the term as [the

---

[23] For the same reasons, ACE is not entitled to claw back any advanced defense costs under § X of the ACE D&O Policy. That section provides for repayment of advanced defense costs to ACE "if and to the extent the Insureds shall not be entitled to coverage for such Defense Costs under the terms and conditions of this Policy." London Aff., Ex. F, § X. NASDAQ was entitled to defense costs coverage from ACE up until the Court, by virtue of issuing this Opinion and Order, resolved the legal uncertainty surrounding the applicability of the "professional services" exclusion.

insurer] has claimed it should be read, and as we have done in this opinion. . . . But until such a ruling issued, the question of whether [the insurer] might be held liable to indemnify [the insured] was in doubt. And, given this doubt, [the insurer's] failure to provide a defense for [the insured] . . . was a violation of its contractual duties.").

Defendants argue that Beazley cannot recover any damages on NASDAQ's behalf because NASDAQ's assignment of its rights to Beazley is barred by the medieval doctrine of champerty, which is codified at New York Judiciary Law § 489. Under that statute, a corporation may not "solicit, buy or take an assignment of . . . any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Judiciary Law § 489(1). "[T]he prohibition of champerty has always been limited in scope," however, "and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs." Trust For the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp., 13 N.Y.3d 190, 199 (2009) (internal quotation marks omitted). Indeed, under the governing case law, "the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim." Id. at 201. In other words, though "acquiring a right in order to make money from litigating it" might implicate the champerty statute, "acquiring a right in order to enforce it" does not. In re Imax Sec. Litig., 2011 WL 1487090, at *5 (S.D.N.Y. Apr. 15, 2011).

Beazley argues that the champerty statute does not apply to it, as the statute carves out any assignment "taken by any moneyed corporation authorized to do business in the state of New York or its nominee pursuant to a subrogation agreement or a salvage operation." N.Y. Judiciary Law § 489(1). The parties dispute whether "pursuant to a subrogation agreement" modifies "moneyed corporation authorized to do business in the state of New York," such that the statute might still apply, or merely "its nominee." But the Court need not wade into these murky waters of statutory interpretation because, even if the statute does apply to Beazley, the assignment at issue was not champertous. While defendants attempt to paint Beazley as an uninvolved third party that acquired NASDAQ's claims solely to profit off of them, this depiction is off the mark. It ignores the reality that NASDAQ was independently seeking coverage of the Facebook Class Action from Beazley, that Beazley had doubts about its own coverage obligations and believed that the D&O policies were implicated, and that Beazley resolved the situation by agreeing to contribute its limit of liability toward the settlement in exchange for NASDAQ's assignment of its rights against defendants in connection with precisely the same settlement. That resolution protected the insured while allowing the insurers to sort out the proper allocation of coverage amongst themselves. If Beazley had wholly prevailed in this litigation, it would have at best been made whole. There was simply nothing champertous about its approach.

Turning to the damages element of the breach of contract claim, "[w]here an insurer breaches the duty to defend," or, in this case, the duty to advance defense costs, "it must pay damages in the form of attorneys' fees and litigation expenses reasonably incurred by the insured in defending the underlying action." United Parcel Serv., 983 F. Supp. 2d at 267-68. ACE argues that Beazley's breach of contract claim fails because NASDAQ has no damages in light of the fact that the defense of the Facebook Class Action has been covered by the E&O insurance tower. As the Court explained in its December 20 Opinion, "Beazley, as NASDAQ's assignee, cannot stand in a better position than its assignor, so if NASDAQ has no damages on a breach of contract claim against defendants, Beazley has no damages as its assignee." Beazley Ins. Co., 2015 WL 9267199, at *11.

Beazley counters that NASDAQ has suffered damages in the form of over $2 million in defense costs that have not been reimbursed. The first $1 million in defense costs was not reimbursed because the Chartis E&O Policy has a retention (i.e., a deductible) in that amount. See Defs.' Rule 56.1 Stmt. ¶ 9. In addition, at least $1 million in additional defense expenses invoiced by Williams & Connolly was not reimbursed by the E&O insurers because such fees were incurred before NASDAQ sought Chartis's approval to retain that firm to assist with its defense. See Pl. Beazley Ins. Co. Inc.'s Statement of Additional Facts in Opp. to Defs.' Mots. for Summ. J. ¶ 19, ECF No. 89.

31

ACE responds that this argument fails because the ACE D&O
Policy itself has a retention of $2 million. See London Aff., Ex. F,
Item 4; see also Defs.' Rule 56.1 Stmt. ¶ 17. In other words, even
if ACE had immediately complied with its duty to advance defense
costs, it would not have been obligated to advance the first $2
million in defense costs that NASDAQ incurred. NASDAQ would have
incurred those fees regardless, and the Court agrees that Beazley
cannot point to those unreimbursed fees as damages. See Hotel des
Artistes, Inc. v. Gen. Accident Ins. Co. of Am., 775 N.Y.S.2d 262,
271 (1st Dep't 2004) ("[I]t is impermissible for a court to enlarge
the bargained-for coverage as a penalty for breach of the duty to
defend" (internal quotation marks and alteration omitted)),
abrogated on other grounds by KeySpan Gas E. Corp. v. Munich
Reinsurance Am., Inc., 23 N.Y.3d 583 (2014); Boyce v. Soundview
Tech. Grp., Inc., 464 F.3d 376, 392 (2d Cir. 2006) ("[D]amages are
meant to put a plaintiff in the same economic position he would
otherwise be in but for a defendant's breach of contract."); Topps
Co. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 269 (S.D.N.Y.
2005) ("Elementary principles of contract law dictate that damages
for a breach of contract should put the non-breaching party in the
position it would have occupied but for the breach; the injured
party should not recover more from the breach than the party would
have gained had the contract been fully performed.").[24]

---

[24] The Court, likewise, does not accept Beazley's argument that
NASDAQ has suffered damages on the theory that any payments made by

But Beazley is entitled to recover NASDAQ's unreimbursed reasonable defense costs in excess of $2 million. And, here, it appears undisputed that NASDAQ incurred a minimum of $10,723.75 in unreimbursed fees in excess of $2 million. See Decl. of Kevin Kieffer in Opp. to Ace Am. Ins. Co.'s and Ill. Nat'l Ins. Co.'s Mots. for Summ J. dated Jan. 29, 2016, Ex. U. ACE has failed to present any argument as to why it should not be held liable for those unreimbursed fees. Accordingly, ACE is not entitled to summary judgment on Count Five, and the case will proceed to trial on that count. At trial, Beazley will not be permitted to re-litigate arguments that have been rejected in this Opinion and Order or to introduce new theories of liability. The sole issue for trial will be the amount of unreimbursed attorneys' fees and costs reasonably incurred by NASDAQ in defending the Facebook Class Action in excess of $2 million.

In summary, for the foregoing reasons, the Court grants ACE summary judgment on Counts Two and Four, but denies ACE summary judgment on Count Five. The Court grants INIC's motion for summary judgment and directs the Clerk of the Court to terminate INIC from

---

the E&O insurers, which should (or could) have been made by the D&O insurers, improperly diluted the E&O insurance tower. Recovery on such a theory of damages would improperly place NASDAQ in a better economic position than it would have been had ACE performed. Separately, given the Court's conclusion that the "professional services" exclusion applies, Beazley's contention that it is entitled to recover fees based on ACE's allegedly unreasonable coverage position and bad faith claims-handling has no merit.

this action. Beazley's motion for summary judgment is denied.

Beazley and ACE are directed to contact chambers jointly by no later

than July 15 to schedule a trial date. The Clerk of the Court is

directed to close the motions at document numbers 59, 60, and 61 of

the docket of this case.

Dated:    New York, NY
          July 12, 2016

_____
JED S. RAKOFF, U.S.D.J.